1   Raymond Whitall
    SVSP G43090
2   P.O. Box 1050
    Soledad CA 93960
3
    Plaintiff, pro se
4

**FILED**

MAY 19 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

6

7

8               UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10

11  Raymond Richard Whitall,        )    Case No. 20-cv-03415-CRB
                                    )
12  Plaintiff                       )   PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
                                    )   FOR SUMMARY JUDGMENT AND REPLY TO
            v                       )   OPPOSITION TO MOTION FOR PRELIMINARY
13                                  )   INJUNCTION
    Vann C. Munk, et Al,            )   Filed: May 20, 2020
14  Defendants                      )   Judge: Hon. Charles R. Berger
    _____)

15      TO THE COURT AND DEFENDANTS:

16      Plaintiff hereby opposes defendants' Motion for Summary Judgment,

17  And hereby replies to defendants' opposition to plaintiffs Motion for Preliminary

18  Injunction. This opposition is based on the points and authorities below, the

19  attached declaration of Raymond Whitall with exhibits, his sworn complaint,

20  And his Motion for Preliminary Injunction. Plaintiff incorporates by reference

21  his Complaint and Motion for Preliminary Injunction, and realleges the claims,

22  facts, contentions, injuries, and arguments alleged therein.

23

24                      OBJECTIONS

25      Plaintiff objects to the following from defendants' Motion for Summary

26  Judgment (MSJ), and requests they be stricken:

1. Declaration of Olivier C. Wu as an unsworn declaration, and as stating his reproduction of unknown defendants (1:25-26 of Wu Motion for Summary Judgment Decl)

2. Exhibit A of Mank Declaration, Inmate Dental Services Program Policies and Procedures, as irrelevant due to not being in effect at any time of the events in this matter (MSJ Declaration of Mank, ¶¶ 4,5).

3. Abernathy Declaration, ¶ 12, and its Exh. C, as that is not a true and correct copy of the appeal. (See attached Declaration of Raymond Whitall (Decl.) ¶2

4. Exhibit A of Ng Declaration, all seven pages as they all are patently incomplete versions of the pages and so cannot provide context; they are incomplete versions of the Meeting Minutes they purport to represent (Decl., ¶3); the first three pages of this Exhibit purport to be the complete set of relevant documents for this meeting date of Sept. 17, 2019. The first and second pages list at least part of the documentation which should be included as part of the Meeting Minutes. Item 1 is the Roll Call for the meeting, with the instruction to document the Roll Call. The second page has the Roll Call for the Aug. 20, 2019, meeting, but there is none for Sept. 17, 2019; for the Sept. 17, 2019 meeting there are no Item 1 contents; the same shortcomings are true for all of the DAR Meeting Minutes and meetings purported to be represented within these seven (7) pages; finally, the seventh page is a sole page appearing to be part of meeting minutes with a handwritten date entered across the top. This portion of a page of part of some DAR Meeting Minutes is inadequate for understanding who took what action, based upon what request and by whom, and when the action was taken. Altogether, these Exhibits are indecipherable and inadequate for providing the court and plaintiff with context.

5. MSJ Mank decl. ¶ 35 for reference to non-controlling regulations. (Decl. ¶29)

*STATEMENT OF FACTS*

Since at least January, 2018, plaintiff has been afflicted with temporo-mandibular joint disorder (TMD), and from at least January 26, 2018, defendants have been aware of this TMD, as well as the pain and inability to chew that plaintiff suffers because of his TMD. These TMD issues have been brought to defendants' attention frequently over the past three years. (MSJ, generally.)

For more than three years defendants have known that an occlusal guard has been prescribed by defendants to treat plaintiff's TMD and relieve his jaw pain. (MSJ 2:36-3:1; Churapco MSJ declaration, ¶16; Munia MSJ declaration, ¶¶ 21, 24, 26, 32, 33, and 36; MSJ, generally.) Over these past three years defendants have held out to plaintiff the myth that an occlusal guard could treat his form of TMD, and that the occlusal guard could be provided specifically to treat his TMD. (MSJ, generally; MSJ 2:36-3:1, 1:15-17, 4:18-20, 4:28-5:2, 5:19-22; Churapco MSJ declaration ¶16; Munia MSJ declaration, ¶¶ 21, 24, 29, 33, 36, and 38.) During the entire time defendants presented an occlusal guard as the panacea to plaintiff's TMD, they also insisted that plaintiff submit to a deep cleaning of his teeth before an occlusal guard would be provided. (MSJ, generally; MSJ 1:15-17, 3:1-3, 3:5-6, 3:20-21, 4:1-2, 9:14-17, 9:18-33.) Defendants Churapco and Munia classified plaintiff's deep cleaning needs as a Dental Priority Classification 2, and his occlusal guard needs as Dental Priority Classification (DPC) 3. (Decl. ¶ 4.) All defendants mentioned the mild periodontitis, deep cleaning needs of plaintiff, and continue to do so, at DPC 2. Defendants misclassified the mild periodontitis and deep cleaning as being required treatment necessarily ahead of the provision of an occlusal guard, and improperly maintained their position for three years.

Defendants demonstrate an awareness and knowledge of the regulations, policies, and procedures relevant to the matter in this action. (MSJ, generally;

1  Chiapero MSJ declaration ¶3; Mraze MSJ declaration ¶3, Monk MSJ declaration
2  ¶3; Ng MSJ declaration ¶2; Attached decl. of Whitsell, Exh. G, ¶9, Omosingo
3  Admission; Exh. H, ¶¶25,26, Sawyer Admission; Exh. I, ¶¶23,24, Rivera Admission) These
4  regulations, policies, and procedures mandate that Mild (or Slight) Periodontitis
5  be coded as DPC 3. The provision of an occlusal guard is also mandated as
6  DPC 3. (Decl. ¶5). Defendants had an opportunity to provide me with an
7  occlusal guard ahead of their required deep cleaning procedure. (Decl. ¶6)
8      As mentioned, defendants held out an occlusal guard as TMD treatment, but
9  would not provide plaintiff with one because he would not submit to a deep cleaning.
10  Sitting through a deep cleaning procedure was and is prohibitively painful for
11  plaintiff (Decl. 10).
12      As mentioned, defendants are aware of CDCR regulations relevant to the issues
13  in this action. Defendants have put on a virtual clinic on the rules, regulations,
14  policies, and procedures regarding occlusal guards, and that an occlusal guard
15  would help treat plaintiff's TMD.
16      Regulations prohibit defendants from prescribing an occlusal guard to treat
17  TMD. (Decl. ¶11.)
18      Plaintiff is afflicted with TMD of the sort affecting the bones and
19  cartilage of the jaw joint areas. The damage to plaintiff's jaw joints has been
20  described as apparently quite extensive. (Decl. ¶12.) An occlusal guard would have
21  served no purpose relevant to plaintiff's jaw damage; an occlusal guard
22  would not have contributed to the removal of bone fragments from plain-
23  tiff's jaw joints; an occlusal guard would not have restored cartilage to
24  the jaw joints; and an occlusal guard would not have enabled plaintiff to
25  chew food.
26  Since June 1, 2018, defendants have been aware that their Oral Surgeon,

1  Dr. Juan F. Luque, recommended and intended to perform intra-articular
2  surgery on plaintiff's jaw. (Luque letter at MPI decl of Raymond Whitall,
3  Ex. C, p. C-1.) This surgery is referred to as "Arthroscopy" by defendant Ng,
4  and is similar to the arthroscopic surgery commonly performed on one's knee.
5  (Decl. Ex. E, p. 2) The initial exam of plaintiff's jaw occurred on May 31, 2018,
6  by Dr. Luque, and it resulted from a decision by the Dental Authorization
7  Review committee, purportedly, on February 21, 2018. From May 31, 2018,
8  the facts are not so clear, and maybe a bit confusing.
9     Defendants claim that on June 20, 2018, they denied plaintiff's request
10 for surgery. (MST 4:33-35) However, the scant documentation for that decision
11 reflects that DAR approved the request. (Decl. Ex. N). Plaintiff was never
12 advised of the DAR decision of June 20, 2018, as stated by defendants as having
13 occurred. Between June 20, 2018, and October 2018, plaintiff heard nothing
14 about his jaw surgery. On October 13, 2018, plaintiff submitted a Health Care
15 Services Request Form (sick call slip) to check on the surgery status. (Decl. ¶ 16).
16 Plaintiff was interviewed by defendant Munk who claims to have submitted
17 to the DAR a request for TMJ surgery. (Id.) No such request was ever made.
18 (Decl. ¶ 17) Defendants confirmed that no such request was made. (Decl. ¶ 18)
19    During the period of events in this action, between about January,
20 2018 and December, 2019, neither defendants Chavdaee, Munk, nor any
21 other defendant submitted requests to DAR or to the Dental Program Health
22 Care Review Committee (DPHCRC) for surgery to treat plaintiff's TMD.
23  (Decl. ¶ 19) (Decl. ¶ 20) (Decl. ¶ 21)
24
25
26

20-cv-03415-CRB, Oppo to MST

1. During the period of events in this matter defendants have insisted that TMD
2. surgery as a curative treatment is prohibited (MSJ generally; Munk MSJ Decl. ¶25; Ng
3. MSJ Decl. ¶7). CDCR regulations allow for TMD surgery, both curative and palliative.
4. (Decl. ¶22) Plaintiff's TMD surgery could have been provided by way of an exception
5. made by defendants. Defendant Munk declares that the causes of TMD vary
6. and can be difficult to pinpoint and treat, and that as a result TMD often
7. fails to adequately respond to surgery, and sometimes resolves itself. (Munk MSJ
8. decl. ¶10) The cause of plaintiff's TMD, by contrast, has been pinpointedly
9. determined by defendants and their Oral Surgeon (Un MSJ decl, Ex B at 9, 12,
10. 36, 43; Motion for Pre. Inj., Whitall Decl. Ex D; Attached Ex. K-1, K-2, K-3).

11. In fact, defendant Ng identified plaintiff's treatment sequence, with specificity.
12. (Decl. ¶23, and Ex. K-1) (Decl. ¶24) The first two therapies he lists are non-
13. curative, but rather are palliative. The last, joint reconstruction, is a purely
14. curative procedure, which defendant Ng suggests I would be a candidate for
15. such when "quiescence is established." That is not in keeping with defendants'
16. collective position that curative TMD procedures are never allowed.

17. Defendants Munk, Champoco, Major, and Ng — as dentists — were at all times
18. not prohibited from prescribing pain medication to plaintiff. (Decl. ¶35) Yet,
19. defendants repeatedly claim that they could not provide pain relief for plaintiff
20. for one reason or another, including because plaintiff's PCP prescribed pain
21. medication (ibuprofen or Tylenol), or that dentists cannot prescribe medica-
22. tion for long-term use. (MSJ 6:1-3, 17:28-13:2, 15:2-3; Munk MSJ decl. ¶31, ¶34;
23. Major MSJ decl. ¶4

24. Defendant Munk, on April 3, 2018, states that he offered me pain medi-
25. cation for my jaw pain. (Munk MSJ decl. ¶31) That medication was ibuprofen.
26. Munk, at the time of trying to get me to take ibuprofen was aware that I

1   suffer from intermittent GI bleeding and that NSAIDs such as ibuprofen

2   are not to be taken by patients who suffer from GI bleeding as they can

3   exacerbate the condition. (Decl. ¶ 36) Defendant Munk's Progress Notes

4   for Apr. 3, 2018 show that he received the health questionnaire which

5   three times notes bleeding problems and GI bleeding (New MSJ decl,

6   Ex. B at 13), and that there were no reported changes to that dental

7   record. (Id., at 40)

8         Defendants state that plaintiff rebutted every attempt of theirs to treat me.

9   (MSJ 1:17-18, 1:24-26). In fact, plaintiff only ever balked at sitting for a deep

10   cleaning on which defendants insisted before they would provide to me that

11   which is prohibited, namely, an occlusal guard to treat TMD.

12         Defendants claim that defendant Champaco scheduled my deep cleaning to be

13   performed over four sessions to accommodate my jaw pain. (MSJ 3, 10-12) and

14   they cite Champaco's declaration to support their "fact". In fact, Champaco

15   stated only that he scheduled plaintiff's SRP deep cleaning for "several"

16   sessions. It is common practice to create the written treatment sequence

17   for SRP as four separate entries. (Decl. ¶ 28)

18         Contrary to defendants assertions (MSJ 6:11-14, 13:5-7; Munk MSJ decl. ¶ 35)

19   defendants, and specifically Munk, were empowered to unilaterally provide for plaintiff's

20   nutritional needs to address his eating impairment and weight loss. (Decl. ¶ 24)

21   Defendant Munk, his supervisors, DAR committee members, and defendant 602 reviewers

22   each had the power and ability to order that plaintiff be given something to

23   eat when he was losing his weight. Defendant Munk, especially, knows better

24   considering that he has been in this position before as a defendant in a

25   prior civil rights action which involved his denying and delaying a prisoner's

26   soft diet. (2015 U.S. Dist. LEXIS 79445, Smith v. Munk; 2013 U.S. Dist. LEXIS

155930, Smith v. Mack)

## ARGUMENT

I. Defendants are deliberately indifferent to plaintiff's serious medical needs and are inflicting upon him cruel and unusual punishment in violation of the U.S. Constitution's Eighth Amendment.

   A. Defendants do not dispute that plaintiff has a serious medical need in the form of temporomandibular joint disorder (TMD) which causes him pain and an eating impairment which has resulted in weight loss. Defendants acknowledge deliberate indifference occurs when they know of and disregard an excessive risk to plaintiff's health and/or of serious harm. The evidence in this matter show that Defendants did just that.

   b. Defendants initially made a showing of trying to treat plaintiff's TMD through the use of an occlusal guard prescribed to him by defendant Champoco. (MSJ 2:26-3:1) An occlusal guard is prohibited by CDCR medical regulations from being used in the treatment of plaintiff's TMD. (Decl. ¶ 11) Simultaneous to Champoco's diagnosis of TMD, and the prescription of an occlusal guard (guard), he diagnosed plaintiff with Mild Periodontitis. (MSJ 2:20-21) He assigned a DPC code of 2 to the Mild Periodontitis, and a DPC code of 3 to the provision of an occlusal guard. This coding required plaintiff to submit to deep cleaning procedures before defendants would give him an occlusal guard. (MSJ 3:1-4) Mild Periodontitis is, by CDCR regulation, mandated to be coded as DPC 3, which would be on par with the provision of an occlusal guard. Despite plaintiff telling Champoco it was painful to open his mouth wide enough to facilitate a deep cleaning for the periodontitis, Champoco insisted that plaintiff submit to a multi-session deep cleaning before getting an occlusal guard. (Champoco MSJ decl. ¶¶ 10-11) Pursuant to CDCR regulations treatment for Mild Periodontitis need not be started for 12 months from date of diagnosis. (CCR 3354(f)(4))

1    Plaintiff, being ignorant at the time of his initial encounter with Churpace,
2    and for some time thereafter, believed the myth told him by Churpace (and there-
3    after by other defendants) that the guard would help his TMD and relieve his pain
4    and enable him to chew, and so plaintiff kept insisting on the provision of the
5    guard. And defendants, to this very day (more than three years later) maintain
6    that an occlusal guard will effectively treat my TMD, and that it is a medically
7    acceptable course of treatment. It is not, and it can never be a medically
8    acceptable course of treatment when it is a prohibited treatment for TMD. To
9    establish deliberate indifference plaintiff must show that the chosen course of
10   treatment was medically unacceptable and that it was chosen in conscious disregard
11   of an excessive risk to plaintiff's health. The first prong is established with the
12   showing that the treatment was prohibited.
13       As to the second prong, defendant Churpace and every defendant thereafter
14   who maintained the myth that plaintiff must submit to the deep cleaning
15   before getting the occlusal guard consciously disregarded the injury and pain being
16   inflicted in plaintiff's mouth through the use of his then-present guard
17   which had been abrading his tongue (MSJ 2:18-19). By their initial and continued
18   insistence that plaintiff's mild Periodontitis be coded as DPC 2 they prevented
19   plaintiff from getting a new guard, and that resulted in the continued infliction
20   of pain and injury to plaintiff's mouth as he eventually began biting holes in
21   his tongue as he slept at night as he clenches his teeth and often could not
22   wear the guard as he slept for fear of scraping his tongue raw. Defendants soon
23   became aware of plaintiff's tongue biting (via MSJ declaration, Ex B at 22), and
24   constant debilitating pain which I explained in a grievance as well as in a dental
25   encounter with defendant Blunk (Id. at 40). By this time, plaintiff's grievance
26   had received a hearing, and the DAR committee had refused to allow the guard

1. without plaintiff first submitting himself to the painful deep cleaning. Defen-
2. dants, over the course of the past three years, have had the opportunity to
3. relent in their fabricated DPC 2 coding of Mild Periodontitis which would enable
4. the provision of an occlusal guard so plaintiff can stop the effects of bruxism
5. and cease injuring his mouth. Yet, defendants—each and every one—continue to
6. consciously disregard the excessive risk to plaintiff's health, and not by accident.
7.      Each and every defendant has years of experience with CDCR dental care
8. and health care, and are familiar with the regulations, policies, and procedures
9. by which they make their decisions which can only be by design       with a wanton
10. and malicious callousness that they continue to inflict pain upon plaintiff.
11.      (( At the same time that defendants on the DAR committee were denying
12. plaintiff to get his guard before his deep cleaning, they took it upon them-
13. selves—without any request by plaintiff or plaintiff's dentist—to have plaintiff
14. examined by an Oral Surgeon. This seems to have been purely pretextual as
15. defendants seem to have already made up their minds—less than three weeks
16. after Chompre denied plaintiff's immediate guard fitting—to ensure plaintiff
17. never get treatment for his TMD. (Decl. ¶ 14)
18.      Either on Feb. 21 or March 21, 2018, defendants officially denied plaintiff
19. his guard before deep cleaning, and approved an unrequested exam by an Oral
20. Surgeon. On May 31, 2018, plaintiff was examined in San Francisco by Dr. Juan
21. E. Luque, DDS, M.D., Oral and Maxillofacial Surgeon. Dr. Luque examined plaintiff,
22. confirmed that he suffered from some rather damaging TMD, and he recommend-
23. ed a course of treatment which included inter-articular (arthroscopic) surgery
24. which he explained to plaintiff would alleviate his pain when eating because he
25. would be removing loose bone fragments from his joints. (Decl. ¶ 24) Dr. Luque
26. never opined that his surgery would cure my TMD. (Decl. ¶ 37) Since that initial

1  examination by Dr. Luque defendants have not returned me to Dr. Luque for the

2  surgery, nor provided the surgery otherwise. (Declaration of Raymond Whitat in support

3  of Motion for Preliminary Injunction (MPI Decl.), ¶9) Defendants state they denied

4  TMD surgery for plaintiff. (MSS 4:21-25)

5      Because defendants' proposed use of a guard to treat plaintiff's TMD was prohibited

6  by CDCR regulation it was rendered a medically unacceptable course of treatment under

7  the circumstances, and it was chosen maliciously (as shown below), and with a conscious

8  disregard of excessive risk of serious harm to plaintiff. As a result, defendants were

9  deliberately indifferent. (Toguchi v. Chung, 391 F.3d 1051, 1058 (9ᵗʰ Cir. 2004) citing Jackson

10  v. McIntosh, 90 F.3d 330, 332 (9ᵗʰ Cir. 1996))

11      In February, 2018, defendant Munk submitted to the DAR committee a DAR

12  Request (Decl. Ex B-1) to deviate from policy and provide plaintiff with a guard prior

13  to deep cleaning. At the time, plaintiff had not been to the Dr. Luque exam so the

14  surgery was not a known factor. In his DAR Request Dr. Munk indicated that there

15  were - for alternative treatments to an occlusal guard: "none". Munk did not enter "N/A"

16  At this juncture on this form; instead, he affirmed that occlusal guard alternatives

17  to treat plaintiff's TMD did not exist. Therefore, at that time, there were no com-

18  peting courses of treatment. And as we now know, an occlusal guard was not a

19  medically acceptable course of treatment since it is prohibited for TMD treatment.

20      As of May 31, 2018, two new, competing courses of treatment came into

21  existence. These would be the proposed surgery to remove pain-inducing bone

22  fragments from plaintiff's jaw joint(s) or the alternative: no treatment at all.

23  Defendants chose the latter, and they did so knowing plaintiff suffered jaw pain

24  when opening his mouth and when trying to eat. (MPI Decl. ¶4 and its Exhs.) Either

25  of these courses of treatment were medical options which, under the circumstances,

26  only one of which a jury would find to be medically unacceptable. Defendants were

20-cv-03415-CRB; Oppo to MST

1  Deliberately indifferent in choosing to not provide surgery, in contravention to Toguchi

2  and Jackson.

3     d. Defendants explain that CDCR policy excludes curative treatment of TMD (MSJ,

4  generally; Munk MSJ decl. 9.35; Ng MSJ decl. 9.7) Here, defendants cite HCDOM

5  Section 3.3.5.14 (c)(8) to support their theory that plaintiff cannot have surgery

6  for his TMD. They put forth a categorical denial. And they do so, first, while ignor-

7  ing (c)(8)(A)'s provision that excluded services refers only to curative treatment

8  and that it does not preclude palliative therapies "to alleviate serious debilitating

9  conditions such as pain management..." (Munk MSJ decl., Ex. B at p. 17) As defen-

10  dants' Oral Surgeon proposed only a minor surgery to remove pain inducing bone fragments

11  (Decl. 9.2-d, and as this was not billed as a cure-all treatment by Dr. Lugue (Decl.

12  9.37) then this was nothing more than a palliative therapy, and defendants knew so.

13     Second, defendants read HCDOM 3.3.5.14 only far enough to get them to the

14  exclusions, and they chose to not read, and thus ignored and disregarded (c)(9)

15  which provides for exceptions to the exclusions, and these exceptions would have

16  enabled defendants to make a helpful decision, as would have CCR § 3999.200(c).

17     It is obvious that defendants disregarded the exceptions clause because defen-

18  dants state that they are familiar with the regulations relevant to their duties and

19  this matter (Decl. Exhs. G, H, I, X; MSJ declarations of Major, Munk, Chuupaco, Ng) and/or

20  intimate and allude to such a knowledge. The relevant regulations regarding exceptions

21  to excluded treatments originate with the California Code of Regulations, Title 15,

22  Division 3, §§ 3350.1(d) (controlling) and 3999.200(c) (effective 8.16.18), and are then

23  codified in the HCDOM. Defendants may not claim ignorance or accident.

24     Months prior to the Oral Surgeon's recommendation for surgery defendants had

25  determined that under no circumstances would they provide TMD treatment and

26  relief for plaintiff. (Decl. 9.14) First, defendants make a behind-the-scenes

1  decision to deny a policy deviation for a guard before a deep cleaning, and
2  they do so one week prior to the DAR committee meeting, a meeting at which
3  such decisions are supposed to be made. Next, defendants pre-determine
4  that there will not be "any TMJ treatment option" made available to plaintiff,
5  three months before the surgery option surfaces. Finally, defendants show
6  how they will construct a defense to their decision to deny plaintiff with
7  treatment — decision yet to be made, officially. Thus, defendants chose to deny
8  the only active course of treatment known to exist, and in so doing they chose
9  the course of providing no treatment at all, a medically unacceptable course.
10  Defendants sole reasoning for denying surgery is that it was against policy.
11  They can not now claim that had they ever considered an exception to excluded
12  treatment they would have reached the same decision because that decision
13  was again based on surgery being against policy. Such an assertion going forward
14  would be a question best left to resolution by a trier of fact.
15  Defendants rely on Amaris v. Hill, 243 Fed. Appx. 353 (9th Cir. 2007) to support
16  their contention that even this court prohibits treatment for TMD for plaintiff.
17  Maybe in 2007 that would have been the hard and fast CDCR regulation, but there
18  is now an exceptions clause to those regulations, and in Amaris, the court quoted
19  a prohibition for curative treatment, not palliative. Even defendants seem
20  to suggest that the proposed intra-articular (arthroscopic) surgery is only palliative
21  (Decl, Ex. K-1), and that curative treatment would come with joint recon-
22  struction. With that, defendants also suggest that plaintiff could have joint
23  reconstruction in the future. (id, at K-2). And the regulations prohibiting plaintiffs
24  surgery was relied upon by defendants and premised upon the proposed surgery being an
25  ineffective treatment and that plaintiff's form of TMD is therefore unamenable to
26  treatment. There is apparently no factual basis for defendants' presumption

1  that plaintiff's TMD is unamenable to treatment and that the proposed surgery
2  would be ineffective. It would, at least, be a palliative therapy that would
3  relieve plaintiff's chewing pain and would allow plaintiff to again chew food.

4      Further, America was absent a difference of opinion as to medically
5  acceptable course of treatment options. Again, the instant case has no options
6  and therefore is not about a difference of opinion. There is and was only
7  one medically acceptable course of treatment legally available to defendant
8  to help plaintiff and that was the palliative surgery

9      All in all, defendants' acts and omissions intentionally interfered with, denied, and
10 thus far delayed treatment for plaintiff. In turn, plaintiff has suffered tangible
11 harm with pain, the development of an eating impairment, weight loss, a nutri-
12 tional deficit, and emotional distress. This court has noted such behavior consti-
13 tutes deliberate indifference (Id., at 354), and that it is violative of the Eighth
14 Amendment. (Id., at 354)

15     c. Defendants denial plaintiff pain relief throughout this past 3-year period,
16 despite their assertions (MSJ 14:10-15, 13:36-37, Munk MSJ decl, ¶ 38) to the contrary.
17 Defendant Munk offered to plaintiff (one time) nothing more than ibuprofen, an
18 NSAID. In his MSJ decl. at 918, Munk defines the pain medications that he
19 prescribes. Because plaintiff has a documented medical history of gastrointestinal
20 (GI) bleeding he cannot take NSAIDs. As NSAIDs tend to exacerbate GI
21 bleeding. (Decl. 936) Munk is aware of plaintiff's GI bleeding history
22 (was MSJ decl. Ex B at 13). Yet, with a conscious disregard of an excessive risk
23 of serious harm to plaintiff, Munk tried to get him to take ibuprofen.

24     Munk and defendants claim to be unable to provide plaintiff with pain medi-
25 cations (other than ibuprofen) at nearly all times because of a policy that prohibits
26 dentists from prescribing pain medications under specified conditions. (MSJ 6:1-3,

1    12:38-2, 15:2-4; Munk MSJ decl. ¶¶8, 31; Mngr MSJ decl. ¶14; Abernathy MSJ decl.

2    Ex. F, At second page, sixth page - second ¶, Ex. G, seventh page - last ¶) There are no

3    such regulation to constrain a dentist from providing pain relief to a patient in the

4    form of medication. (Decl. ¶25) This is but another example of defendants' deliberate

5    indifference toward plaintiff's serious medical needs and their conscious disregard of

6    the harm that has resulted through the infliction of unrelenting pain. Through this

7    ruse defendants continuously denied plaintiff any effective pain medication, and

8    demonstrated their deliberate indifference as their effective denial of pain

9    medication throughout these events is medically unacceptable under the circum-

10    stances.

11      f. Defendants claim to have made multiple referrals to the DAR committee in an effort

12    to help plaintiff. (MSJ 13:33-34) However, records indicate that Munk made only one

13    such referral as there exists only one DAR Request form. (Decl. ¶¶17, 18) Defendants

14    have produced a seemingly hodgepodge collection of purported DAR Minutes which

15    are alleged to represent the serious, formal consideration of plaintiff's TMD treat-

16    ment, yet the seven (7) pages of documents produced are random pages of incom-

17    plete DAR Minutes which are incomprehensible. (Decl. ¶3; Ng MSJ decl., Ex. A)

18    Indeed, for one purported DAR meeting (of June 20, 2018) defendants produced

19    (and included as an exhibit to their Motion for Summary Judgment) a single page

20    with a handwritten date across the top, which is supposed to represent the DAR

21    Minutes for that meeting date. (Ng MSJ decl. Ex. A) Plaintiff requested of the

22    CDCR all DAR Meeting Minutes of the Salinas Valley State Prison's DAR committee for the

23    dates relevant to this matter and which defendants claim to have DAR activity. Defen-

24    dant CDCR responded that it has no such documents for February, 2018, and November,

25    2018, and that the seven (7) pages of DAR documents produced to plaintiff (Ex. P.)

26    represent such ShareDrive posting for all of the other months. (Decl. ¶37) Except that

1    the referenced documents did not come from the CDCR's Share Drive folder for SVSP,

2    or else there would have been, at the very least, an equal number of pages (3) for

3    each meeting month of March, June, and October, 2018, and Sept, 2019, yet there

4    are but seven (7) pages for all four of these months - total. Defendants have demon-

5    strated through their own records that they not only made no effort to provide

6    dental care to plaintiff, but that they coordinated their pre-determinations to

7    not provide care, and they orchestrated their compilation of the record in their

8    effort to justify and defend their decisions. (Ex. K-3) With this, defendants can

9    be viewed in no other way than being deliberately indifferent to plaintiff's serious

10    medical needs, pursuing medically unacceptable courses of treatment under

11    the circumstances and in conscious disregard of an excessive risk of serious harm

12    to plaintiff.

13     6. Defendants were deliberately indifferent to plaintiff's nutritional needs once he

14    could no longer chew solid food. Defendants claim that Munk had no authority for

15    providing for plaintiff's nutritional needs (MSJ 6:10-14, 13:5-7; Munk MSJ Decl. ¶35).

16    Munk was empowered and authorized to unilaterally order both a soft diet and nutri-

17    tional supplements (Boost drink) for plaintiff pursuant to HCDOM 3.1.12. (Decl. 29, Ex. W)

18    By extension, health care grievance reviewers were empowered to order Munk and/or

19    dental supervisors at SVSP to provide plaintiff with a liquid nutritional supplement

20    such as the Boost drink. Instead, in keeping with his pattern of behavior (Munk MSJ

21    Decl. ¶31, ¶34, ¶35; MSJ 6:14-16, 6:5-6) Munk shirked his responsibilities by passing

22    off plaintiff to another health care provider, thereby ridding himself of the

23    problem of plaintiff. In keeping with their determination to not provide for plaintiff's

24    dental needs during these events, dental supervisors and 602 reviewers - as defen-

25    dants in this action - failed to provide. All defendants did so in conscious disregard

26    for the excessive risk to plaintiff's health which has thus far manifest itself in

1  plaintiff's weight loss of 47 pounds, or about 25% of his body weight, nutritional
2  deficiency marked by his lack of energy, lethargy. Defendants at SVSP, and
3  particularly defendant Mank, are specifically aware that failing to provide for their
4  patients' nutritional needs is a violation of the patients' rights. (See Smith v.
5  Mack, U.S. Dist. LEXIS 79995; 2013 U.S. Dist. LEXIS 155920) Certainly at least
6  Mink cannot feign ignorance of the regulations pertaining to nutritional supplements
7  and soft diets for plaintiff. He and defendants have demonstrated a malicious
8  and callous intent toward plaintiff by doing so.
9     h. Defendants Ng and Major are grievance-reviewing dentists in this action.
10  As such, they knew not only the rules, regulations, processes, and procedures
11  relevant to this action, but they also knew of the health care (dental) aspects.
12  As dental supervisors and grievance reviewers they were uniquely positioned and
13  empowered to intervene in events and to provide for plaintiff. That they did not,
14  evinces a conscious disregard of the excessive risk of serious harm to plaintiff,
15  a harm which became manifest.
16     Other 602 reviewers in this matter had the inherent authority to intervene and pro-
17  vide for the constitutionally adequate care of plaintiff, but they failed to respond
18  to plaintiff's requests for help. (Abernathy decl. Exs. B, C, F, G, H) As such, they
19  can held liable. (Peralta v. D. Hood, 744 F. 3d 1076, 1085-86 (quoting Jett v. Penner,
20  439 F. 3d 1091, 1098 (9th Cir. 2006) (9th Cir. 2014) (en banc)) The 602 reviewing defendants
21  want this court to believe they are not liable for their failure to intervene because
22  they are not dentists and they left these matters to the educated, experienced,
23  licensed professionals. That argument is without merit. Here's why.
24     Unlike in Peralta, where defendant Fitter (arguably) could only have judged
25  the matter before him on a 602 based on medical education and experience, the
26  defendants in the instant case need no such medical or dental education,

experience, or licensure. The instant case is almost not even about medical
issues, at least not in the sense of what would have been appropriate care
and treatment under the circumstances. A lobotomy or a Botox injection?
This case really boils down to the regulations and defendants' disregard for
them, their manipulation of them, and their misrepresentation of them. And
the reviewing defendants are as complicit as the dental professionals
because in deciding the propriety of treatment for plaintiff the reviewing
defendants had only to rely on the written rules and regulations pertaining
to A) the DPC coding for Mild Periodontitis; b) the provision of an occlusal
guard in a timely manner when on par with the proper DPC coding of plaintiff's
Mild Periodontitis; c) the prohibition of an occlusal guard to treat plaintiff's
TMD; and d) the curative and palliative treatment provisions and the related
exclusion exceptions available to all defendants.

   Nobody needed to perform a medical analysis of how the dental pro-
viders came to their professional conclusions on how to treat plaintiff's
TMD, and resultant injury. They needed only to read the rules to know that
those professional conclusions and the chosen course of treatment were in
violation of the rules. These treating defendants didn't really even make any
medical judgment calls. There has never been any debate as to what ails
plaintiff, nor that he needs help for his TMD. After the TMD diagnosis
there were no medical decisions left to be made. Rather, there remained
only decisions based on regulations and, in the case of treating defendants,
how best to manipulate them, skirt them, disregard them, conceal them, mis-
represent them, ad nauseum.

   In the grievance responses, defendant 602 reviewers claim to have
consulted the controlling rules (Abernathy decl. Exs. B, C, F, G, H) and, in their

1  Admissions. The reviewing Defendants Admit their decisions were based on
2  the governing rules and regulations (Decl., Exs G, H, I; and ¶ 33) I believe
3  it is safe for the court to assume that the other CDCR Administrators who are
4  reviewing Defendants also based their reviews and decisions on their working
5  knowledge of the rules. Since that is so, it is apparent that the reviewing defen-
6  dants disregarded those provisions of the rules that would have helped plaintiff,
7  and instead ignored them in conscious disregard of an excessive risk of serious
8  harm to plaintiff.
9      i. Defendants' treatment decisions based on policy created a constitutional
10  violation of plaintiff's rights. As applied by defendants, the TMD surgery exclusion
11  of CCR § 3350.1 (A)(2)(B) (the controlling law) is a constitutionally violative policy
12  when, as defendants did here, the exclusion is applied so as to preclude giving
13  plaintiff any care and treatment for his TMD, and when other treatment options
14  simply don't exist. The result is that the complete absence of surgery would and
15  has served to leave plaintiff without the ability to chew food and there is no
16  relief in sight as there is no other treatment option other than surgery to provide
17  the requisite pain relief, so as to enable plaintiff to eat. Summary Judgment has been
18  denied when decisions were made based on Administrative policy. (Lindley v. Corizon Health,
19  2020 U.S. Dist. LEXIS 62496 (D. Ariz., Apr. 9, 2020) at p. 30, citing Colwell v. Bannister,
20  763 F. 3d 1060, 1069 (9ᵗʰ Cir. 2014).) The Colwell court also recognized as the paradigm
21  of deliberate indifference the blanket categorical denial of medically indicated surgery
22  based solely on administrative policy. (Colwell, id., at 1063)
23      j. Plaintiff has not brought defendant Atchley into this action under a theory of
24  respondent superior. However, Atchley is responsible for the implementation and applica-
25  tion of constitutionally violative policies at his prison and, as such, he can facilitate the
26  provision of surgery for plaintiff should a preliminary injunction issue. Atchley, as

1   clearly stated in the Complaint, brings this action against Atchley in his official

2   capacity. (Complaint, ¶10)

3       K. Were it not for the acts and omissions of defendants, plaintiff would not then

4   nor now experience the injuries he has. Defendants' entire premise for proximate

5   cause of injuries is plaintiff's refusals to submit to deep cleaning. Defendants present

6   this as "Whitaker's own, voluntary decision to forego all dental treatment..." (MSJ

7   17:21. That's quite a stretch since the record clearly reflects that I was willing

8   to accept, and insisted upon, the palliative surgery, and even the useless and pro-

9   hibited occlusal guard. As it turns out, the only treatment I refused was actually

10  not even required since defendants manipulated the D.P.C. coding for it. It is clearly

11  the malicious, intentional, wanton, manipulative, deceitful acts and omissions of

12  defendants which have caused plaintiff to suffer the injuries inflicted by defen-

13  dants. Plaintiff has well-demonstrated that defendants' deliberate indifference

14  is the actual and proximate cause of plaintiff's Eighth Amendment rights depriva-

15  tion, in keeping Bordeleo v. Madoca, 2019 U.S. Dist. LEXIS 55965 (N.D. Cal.,

16  April 1, 2019), Case No. 17-cv-05724-CRB (citing Leer v. Murphy, 844 F.2d 628,

17  634 (9th Cir. 1988). This court reiterated the Leer holding that the individual

18  defendants' duties and responsibilities must be individualized and focused upon

19  during the court's inquiry into causation. (Leer at 633)

20      1. Defendants are not entitled to qualified immunity for lack of existing precedent

21  as defendants state the issue too narrowly in their argument when claiming there

22  exists no precedent requiring them to ignore plaintiff's Mild Periodontitis simply

23  because the procedure would be too painful for plaintiff to submit to a deep

24  cleaning. The proper question is if whether there exists precedent for the very

25  specific act, and it is not necessary for the very action in question to have

26  previously been held unlawful. (Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.

1    1996) citing Anderson v. Creighton, 483 U.S. 635, 640 (1987).) Jackson

2    further recognized that to "define the law in question too narrowly would

3    be to allow defendants to 'define away all potential claims.'" (Jackson,

4    id., at 332, quoting Kelley v. Borg, 60 F.3d 664, 667 (9ᵗʰ Cir. 1995)) Defen-

5    dants are not entitled to qualified immunity as their deliberate indifference

6    to plaintiff's serious medical needs is well-defined as unconstitutional.

7    (Estelle v. Gamble, 429 U.S. 97 (1976)) And, a medical need is serious if the

8    failure to treat it will result in "significant injury or the unnecessary and

9    wanton infliction of pain." (Peralta v. Dillard, 744 F.3d 1076, 1081 (9ᵗʰ Cir.

10   2014) (en banc) (citations and quotation marks omitted). And a prison official

11   is "deliberately indifferent" to that need if he or she "knows of and disregards

12   an excessive risk to inmate health." (Farmer v. Brennan, 511 U.S. 825, 837 (1994))

13        In addition, summary judgment on qualified immunity is precluded where

14   summary judgment on the underlying constitutional question is precluded. (Williams v.

15   Kohler, 2017 U.S. Dist. LEXIS 33361 *9 (N.D. Cal., Mar. 8, 2017) citing Smith v

16   Mack, 2015 U.S. Dist. LEXIS 79995 *4 (N.D. Cal., June 19, 2015).) Defendants

17   are not entitled to qualified immunity

18        m. CDCR is immune from Section 1983 liability. Plaintiff did not bring such

19   a claim, and the court did not sustain such a claim.

20

21   II. Defendants' argument against plaintiff's ADA/RA claim is without merit. Moreso,

22   it is very confusing. Defendants sort of concede that plaintiff has an eating

23   impairment constituting a disability. (MSJ 20:12-13) From there, defendants'

24   argument and reasoning goes astray.

25        Throughout their entire argument defendants attempt to lead this court

26   to believe plaintiff's ADA/RA claims revolve around being denied to "receive the

1  benefit of CDCR's services, programs, or activities, i.e., an occlusal guard"
2  (MSJ 20:24-25) (internal quotation marks omitted); being "excluded or otherwise
3  discriminated against by the public entity" relating to the "benefits of CDCR's
4  dental services" because plaintiff was repeatedly provided with opportunities to enjoy
5  those benefits (MSJ 20:36-38); that plaintiff was denied an occlusal guard be-
6  cause he refused deep cleaning, "not because he suffered from an eating impair-
7  ment" (MSJ 21:7-8); and that plaintiff, "was not denied jaw surgery because
8  he was unable to chew his food" (MSJ 21:9). Plaintiff's ADA/RA claims read
9  nothing like this. (Decl. ¶ 38)
10  Next, defendants approach the ADA regulation to require public entities to
11  make reasonable modifications in policies, practices and procedures unless the
12  "modifications would fundamentally alter the nature of the service, program, or
13  activity," as though the regulation refers to the fundamental alteration of CDCR
14  policy. (MSJ 21:16-17) (emphasis added) This regulation requires reasonable modifi-
15  cations to CDCR policies, etc., when such would not "fundamentally alter the
16  nature of the service, program, or activity" (28 C.F.R 35.130 (b) (7) (i)), not of
17  CDCR policy.
18  Plaintiff was denied the services, programs, and activity of eating CDCR-provided
19  meals at their meal service, and of recreational activity and exercise provided
20  by CDCR because of his eating impairment. Plaintiff was denied dental care
21  because of (among other things) CDCR's timely policies which, here, defendants
22  claim is that of curative TMD surgery.
23  Defendants fail in their attempt at their misconstrued interpretation of
24  plaintiff's ADA/RA claims. As stated in his Motion for Preliminary Injunction, ¶4,
25  plaintiff suffers an eating impairment (MPI decl. ¶ 4) which is the only obstacle
26  to plaintiff's fully participating in the CDCR's meal service. (Decl. ¶ 39) Defendants

do not dispute that plaintiff has an eating impairment caused by his jaw damage, nor that plaintiff has lost a significant amount of weight (about 47 pounds as of his latest weighing on January 15, 2021), nor that defendants' provision of a nutritional supplement (which they subsequently terminated) only arrested plaintiff's weight loss, but did not restore it, nor that plaintiff's eating impairment causes plaintiff to be unable to participate in CDCR's meal service, and exercise and recreational programs, services, and activities as can other, non-disabled prisoners. None of that has been disputed by defendants.

Defendant CDCR should not be granted summary judgment on plaintiff's ADA and RA claims.

III. Because summary judgment is inappropriate on all of plaintiff's federal claims, the court should retain supplemental jurisdiction over plaintiff's state law claims.

IV. As demonstrated herein and in his MPI, plaintiff is able to prove every element of each of his claims before a trier of fact. Because plaintiff has fulfilled all of the requirements for the issuance of a preliminary injunction, this court should issue the preliminary injunction.

CONCLUSION

The evidence is clear in this case that defendants have inflicted upon plaintiff cruel and unusual punishment in violation of the U.S. Constitution's Eighth Amendment, and that plaintiff's Fourteenth Amendment and ADA/RA

1  rights have been violated. Although defendants attempt to paint a pretty
2  picture of them trying to be so helpful to plaintiff, the evidence demonstrates
3  otherwise, from their disdain and disregard for the regulations meant to
4  actually help plaintiff, to their manipulation, misapplication, and mis-
5  representation of these regulations, to their behind-the-scenes backhanded
6  dealing with this matter. Plaintiff has certainly presented enough to establish
7  genuine issues of material fact for this to be presented to a trier of fact.
8  Because of that, plaintiff requests this court to deny summary judgment
9  across the board, and to issue a preliminary injunction as soon as practical.
10
11  Respectfully Submitted,          Executed On: May 17, 2021
12
13  Raymond Whitall
14  Raymond Whitall,
15  Plaintiff, pro se
16
17
18
19
20
21
22
23
24
25
26

Declaration of Raymond Whitall

I, Raymond Whitall, hereby declare:

1. I am the plaintiff in this matter, familiar with the facts stated herein, and can and will testify to them if called to do so;

2. I compared my copy of the grievance (602) represented in Exhibit C of the Abernathy Declaration and found that the proffered Exhibit represents only partial pages;

3. I have reviewed the DAR documents attached to Exh. A of the lly Declaration of defendants' Motion for Summary Judgment (MSJ), and I compared them to other DAR documents. I also reviewed the regulations covering the Dental Authorization Review Committee (DAR) for their document requirements, and I compared the Exh. A DAR results with versions of the same DAR results I received in discovery. None of the seven pages contain the written stated reasons for the case decisions as they would in the complete state; none of the meeting date documents include the required Dental Authorization Review Request from the referring dentist as is required by regulations found in the Health Care Department Operations Manual, Section 3.3.4.5(c)(4)(C) 1. and 2. (See attached Exh. A.), and including the required CDC 7243, Health Care Services Physician Request for Services (See attached Exh. B. for a sample of a Dental Authorization Review Request, and a sample of a CDC 7243, Health Care Services Physician Request for Services) which provide context for the services requested by the referring dentist, and the manner in which the request was presented; Ex. A is a true and correct copy as received from defendants.

4. During his initial examination of plaintiff in this matter, defendant

20-cv-03415-CRB; Decl of Whitall

1  Champoco assigned a Dental Priority Classification code of 2 (DPC) for plain-
2  tiff's Mild Periodontitis, and a DPC 3 for the provision of an occlusal
3  guard (guard) to plaintiff. (Ex. C.) At a February 9, 2018, encounter
4  with plaintiff, defendant Mank diagnosed plaintiff with periodontitis (Mank
5  MST Declaration, ¶ 11) and thereafter maintained at DPC 2 plaintiff's Mild
6  Periodontitis. (Ex. C, pp. 2, 3.) Throughout the past three years all defen-
7  dants have maintained plaintiff's Mild Periodontitis as DPC 2.
8      5. California Code of Regulations, Title 15, Division 3 (CCR) former § 3354
9  (f)(4), and current § 3999.367(g)(4)(C) require that a diagnosis of mild
10  periodontitis, requiring SRP, be assigned as DPC 3, the same as that of a
11  guard. The Health Care Department Operations Manual (HCDOM) Appendix 1
12  to Section 3.3.5.3, at DPC 3, includes slight periodontitis requiring SRP.
13  (Ex. D.) HCDOM Section 3.3.2.4 defines "Slight Periodontitis," in a graph (Ex. E)
14  with Indicators and their criterion. The indicators measured by defendant
15  Champoco in diagnosing mild periodontitis (that of Mobility and Probing as recorded
16  on Champoco's Periodontal Chart (Ex. F) on 1.26.18) are consistent with that of
17  Slight Periodontitis shown on Ex. E. This HCDOM Section 3.3.2.4 at sub-section
18  (c)(2)(C)(2)(b) requires a DPC 3 for slight periodontitis, consistent with
19  that of mild periodontitis. Based on my reading and comparison of these
20  regulations I believe that defendants Champoco and Mank misclassified my
21  mild periodontitis as DPC 2 when it should have been properly classified as
22  DPC 3. Such a DPC code would have put the deep cleaning on par with
23  the guard.
24      6. In my health care grievance (602) # SVSP HC 18000931, defendant
25  Omosanje alludes to a guard being able to be provided prior to deep cleaning
26  if both procedures are at the same DPC code. (MST, Declaration of Abernathy,

Ex. B, seventh page, At INTERVIEW.)

7. On January 6, 2021, defendant Omosaiye responded to plaintiff's First Request for Admissions. A true and correct copy of excerpts of Omosaiye's admissions are attached as Exhibit G.

8. On January 6, 2021, defendant Sawyer responded to plaintiff's First Request for Admissions. A true and correct copy of excerpt of Sawyer's Admissions are attached as Exhibit H.

9. On January 6, 2021, defendant Rivera responded to plaintiff's First Request for Admissions. A true and correct copy of excerpt of Rivera's admissions are attached as Exhibit I.

10. A deep cleaning procedure requires plaintiff to open his mouth (and jaw) to the widest extent possible. Doing this causes plaintiff to experience unbearable pain. This prevents me from being able to sit for a deep cleaning, or for a comprehensive dental exam. I informed defendants of this pain and my inability to endure opening my mouth for it, and defendants acknowledge their awareness of that. (Exh. H of Abernathy MSJ decl. first page, fourth page, ninth page at fifth ¶; Chungae MSJ decl. ¶10; Munk MSJ decl. ¶22; Wu MSJ decl. Ex. B at 32 and 33; MSJ 10:6-7.)

11. I have read HCDOM Section 3.3.2.6, Dental Prosthodontic Services, which govern the use of occlusal guards for CDCR prisoners, including plaintiff. HCDOM 3.3.2.6 (c)(1)(I) prohibit the fabrication of an occlusal guard to treat TMD. Based on my reading of this regulation I believe that defendants could not provide me with an occlusal guard to treat my TMD, nor the symptoms of my TMD. I further believe that an occlusal guard is prohibited for TMJ dysfunction (TMD) because - at least in my case - it would not result in the removal of any bone fragments in my jaw joints, nor allow me to chew my food without pain. A true and correct copy of

20-cv-03415-CRB; Decl. of Whitall

3

1  HCDOM 3.3.3.6 B. Attached as Exh. J.

2     12. I have read health care records created and monitored by defendants and

3  their agents, and which describe the damage and condition of my jaw joints. The

4  damage and condition has been described as: 1) Clicking upon opening and closing

5  of mandible... Slight deviation to the right upon opening. Pt cannot open mouth for

6  long period of time due to pain. Right condyle irregular in shape beaking and flat-

7  tening... (Motion for Preliminary Injunction (MPI) Decl. of Raymond Whitall, Ex. A, p.1);

8  2) limitation to open his mouth, decrease in the intraarticular space and flattening

9  (sic) of the condylar heads and osteoarthritic changes. (Id, Ex C, p. C-1); 3) Sub-

10  chondral cystic changes of the left mandibular condyle with questionable erosive

11  component. No identifiable soft tissue mass. Flattening of the superior mandibular

12  condyle. Soft tissue opacification in the overlying mastoid air cells extends

13  through the temporal fossa. There is joint space narrowing. No identifiable

14  soft tissue mass. [for both left and right TMJ.]. Arthritic changes at the

15  left TMJ... in the setting of rheumatoid arthritis. (Id., Ex. D);4) There is

16  severe right condylar resorption. The joint is bone on bone. (Attached Ex. K);5) TMJ

17  internal derangement (Id., at p.2)(for left joint); 6) The right TMJ has severe internal

18  derangement... The disc is absent. (Id, at p.3)

19     13. As early as February 21, 2018, and no later than March 29, 2018, defendants

20  generated documentation apparently approving sending plaintiff to an outside

21  Oral and Maxillofacial Surgery consultant (OMFS). Through discovery, on March 23,

22  2021, plaintiff required an email purportedly containing the February 21, 2018,

23  approval by the prison's Dental Authorization Review (DAR) committee (attached

24  hereto as Exhibit L, which is a true and correct copy of that which I received

25  from defendants) to provide for an examination of my jaw.

26     14. I also received through discovery on March 23, 2021, a series of emails

1  between defendants discussing the defendants' decision to deny me with
2  treatment for my TMD. (See attached Exhibit K-3, which is a true and
3  correct copy of that which I received from defendants.) These emails are
4  dated February 15, 2018 and, reading from the bottom, up, cover a period
5  of less than 75 minutes. The first email, at 8:30AM, from defendant
6  Ng (who is the DAR committee Chairman and the Supervising Dentist over
7  SVSP dentists) shows defendant Ng deciding I must undergo the previously-
8  prescribed periodontitis treatment before I can have the previously-prescribed
9  guard. This decision by defendant Ng — in consultation with defendant
10  Munk — is made about a week before the Feb. 21, 2018, DAR meeting
11  and decision denying the guard before the deep cleaning procedure. This
12  series of emails also demonstrates the defendants establishing their position
13  that I will not be provided "any TMJ treatment option." (at 8:30AM) The final
14  email in this series (at 9:44:51 AM) demonstrates defendants stating that Munk's
15  documentation provides a defense to their decision; a decision not yet made, officially.
16  15. I received through discovery from defendants a document purporting to be
17  a DAR decision made on 6-20-18. (Ex. N.) This is a true and correct copy of
18  that which I received from defendants, and it is similar to the seventh page of
19  Ex. A of the Ng MSJ decl. (Ng MSJ decl., Ex A, page 7.) Ultimately, plain-
20  tiff was never sent back to Dr. Luque for any sort of follow-up.
21  16. Between June 1, 2018, and October 13, 2018, I was not advised by
22  anybody of the status of the jaw surgery that I had been anticipating. On
23  October 13, 2018, I submitted to the dental department a Health Care Services
24  Request Form (sick call slip) requesting to know the status of the surgery. (Wu
25  MSJ decl., Ex. B, at 4.) As stated by defendants, I was seen by Munk in
26  response to my sick call slip. Munk's notes of that October 22, 2018, encounter

1  reflect that he made a referral to DAR to request TMJ surgery, (Id. at 36.)

2  Through discovery to defendant Munk I requested both the DAR Request and

3  the Health Care Services Physician Request for Services (RFS) pertaining to the

4  October 22, 2018, Encounter and DAR referral claimed to have been made by defen-

5  dant Munk in his declaration. (Munk MSJ declaration, ¶28.).

6      17. My RFP for the Oct. 22, 2018, DAR referral documentation was non-productive.

7  (Ex. O-10-11(RFPs 22+23).) In response, I was referred to RFPs #2 and #1,

8  respectively (Ex. O-9). These RFPs to Munk produced three documents which

9  are irrelevant to my RFP for the Oct. 22, 2018 DAR referral documentation.

10 The three documents referred to consist of two RFSs from March and June

11 2018, and a screenshot "sample" of what Munk refers to as a "DAR Request"

12 (Ex. Q) I have read the procedures relating to the process a dentist is to follow

13 when requesting approval from the DAR committee. That process is detailed in

14 HCDOM section 3.3.4.5 (c)(4)(B) and (C) 1. and 3. (Ex. A) The process very

15 clearly states the dentist shall complete both an RFS and a DAR Request

16 for off-site treatment (subsection (c)(4)(C)1.) An RFS is a document as in

17 Ex. Q-1 & -2. A "DAR Request" is a formal document requiring the dentist's time

18 and attention so as to explain the treatment and condition to the DAR committee.

19 (Ex. B) This DAR Request of Ex. B was never produced to me by any of the

20 three defendants from whom I requested DAR Request documents. Rather,

21 it was included as an attachment to an email made in a separate

22 request. Subsection (c)(4)(C)3. requires the dentist to also enter the

23 DAR-related treatment request into the Treatment Request Manager

24 program of the Electronic Dental Record System used by dental staff,

25 including defendants. Based on my reading and comprehension of HCDOM

26 Section 3.3.4.5 (Ex. A) I believe that Ex. Q-3 (defendants' Bates A60.00690)

20-cv-03415-CRB; Decl. of Whitfall

1  is part of the Electronic Dental Record System (EDRS) referred to in the regulations.
2  Also based on my reading and comprehension of HCDCM Section 3.3.4.5 (Ex. A) and on
3  information received from defendants, Ex. Q-3 is a screenshot of the Treatment
4  Request Manager, and that this portion of the DAR referral process is separate and
5  distinct from the completion of the DAR Request document. This "screenshot"
6  (as Ex. Q-3) does not in any way relate to my RFP of Oct. 22, 2018 - related DAR
7  referral documentation.

8    18. On about April 29, 2021, I sent to defendants' counsel a letter expressing my
9  concerns with the non-production to my related Oct. 22, 2018 referral requests which
10  were contained in Monk RFPs, 22 + 23. I received a reply to my letter from defendants'
11  counsel (Ex. O-16-18). In item 2.A. of his reply, counsel informs one that DAR Requests
12  are "generally" completed through the program represented in defendants' screenshot.
13  In item 2.B. of his reply, counsel informs me that all documents responsive to RFPs,
14  22 and 23 have already been produced. Based on the responses to my relevant discovery
15  requests, and based on the representations of counsel, I believe that defendant Monk made
16  no other proper and legitimate requests for treatment outside of that which is represented
17  in Ex. B, and specifically that he made no proper and legitimate Oct. 22, 2018 related
18  DAR Request.

19    19. Through an RFP to defendant Monk I requested all Requests for Services and
20  DAR Requests prepared by him between January 26, 2018 and December 31, 2019, and
21  pertaining to plaintiff. Defendant produced two RFSs (Bates AGO 00688, 689), and a
22  screenshot of an "example" of a Treatment Request Manager entry (Bates AGO 00690).
23  (Ex. Q) (Ex. O-9) In response to my meet + confer letter to defendants' counsel,
24  counsel advised me that "In any case, Defendants have produced all responsive docu-
25  ments found in its possession, custody, and control relating to relevant DAR requests."
26  (Ex. O-16)

20-cv-03415-CRB; Decl of Whitall

20. Through an RFP to defendant Gates I requested all relevant Dental Program Health Care Review Committee (DPHCRC) dating between January 26, 2018 and Aug 20, 2020. No responsive documents were found. (Ex. S)

21. Through an RFP to defendant Omorine I requested DAR documents relative to this matter, and defendant provided seven pages of purported DAR Minutes. (Ex. P) (Ex. O-2) I also requested relevant DAR and DPHCRC requests/referrals made in this matter. The response referred me to RFP #4 at Ex. O-2. (Ex. O.3-4) A supplemental response informed me that no other documents were found. (Ex. O.6-7)

22. CCR § 3350.1 (which was controlling at the time I was diagnosed with TMD, at the time surgery was first proposed on May 31, 2018, and at the time DAR purportedly denied surgery), and its replacement § 3999.200, provide that the term "treatment" refers to curative treatment and does not preclude palliative therapies to alleviate serious debilitating conditions. (§§ 3350.1(A), and 3999.200(b)) CCR §§ 3350.1 (A)(2)(B) and 3999.200 (b)(2)(A) provide that such curative treatment shall not be provided for TMD. However, both the former and the current CCR provides for exceptions to be made for such curative treatment. (§§ 3350.1(d), and 3999.200(c)) According to both CCR sections, part of the process for making an exception for my TMD surgery is getting the approval of the person's Dental Authorization Review committee (§§ 3350.1(d)(2), and 3999.200(c)(5)) The HCDOM, Section 3.3.5.14(c)(q) provides for the same exception. (Munk MSJ decl., Ex. B at 17) In his declaration, defendant Ng referred specifically to the HCDOM section on exceptions. (Ng MSJ decl. ¶9)

23. In preparation for trial I have been learning about TMD, and gaining a knowledge of relevant terms. Defendant Ng states in Ex. K-1 that arthrocentesis is a part of TMJ treatment. I have read that arthrocentesis involves the flushing out of the temperomandibular joint with a sterile solution in order to

1  lubricate the joint and to reduce inflammation. My reading leads me to believe

2  this is an arthroscopic sort of procedure rather than an open-joint

3  procedure, and that it is a palliative therapy rather than curative.

4     24. As I have previously stated, on May 31, 2018, during my examination

5  by Dr. Luque, he informed me that his proposed surgery was designed to remove

6  my loose, floating-around bone fragments from my jaw joints in order to

7  alleviate the pain I experience when chewing. Based on this information from

8  the Oral Surgeon himself, I believe this intra-articular (arthroscopic) surgery

9  is a palliative therapy rather than curative.

10     25. Through discovery to defendant Monk in the form of admissions, Monk

11  admitted that he is not aware of any regulations that would prohibit him from

12  altering pain medication prescribed to me by my medical doctor (PCP). (Ex. T, RFA 9)

13  Similarly, I requested from Monk documents reflecting the regulations which

14  prohibit dentists from altering a patient's pain medication prescribed by a PCP.

15  Monk could find no such regulations. (Ex. O-9.1, RFP #4) I have researched CDCR

16  rules and regulations and I have found no regulations nor guidelines no policies

17  which prohibit or discourage dentists from providing for pain relief through

18  medication prescriptions, regardless of a patient's PCP having already

19  done so.

20     26. I have experienced GI bleeding for many years. At all times during

21  the events in this matter my GI bleeding condition has been prominently

22  displayed on dental documentation accessible to defendants, (Wu MSJ decl., Ex B,

23  at 13) And with no fewer than three such entries.

24     27. All documents attached hereto are authentic, true, and correct copies

25  of that which are on file with defendants and provided to me, and/or as were

26  provided to me by defendants.

38. As a patient of defendant dentists, it has always been my experience that when planning SRP treatments for me the defendants document the sequence separately, by quadrant. My experience is that this is common practice. Attached Exh. U show five such treatment sequences over the years. These are taken from my dental records. These are representative of defendants' common practice. I found none which sequence the treatment in less than four entries for all quadrants. The fifth page of Exh. U is that of the 1.26.18 sequencing by defendant Champaco, and it represents that he actually indicated that the SRP of the quadrants would occur in two (2) sessions of two quadrants each — Another common practice of defendants, to perform SRP in two sessions. Ex. U are true and correct copies from defendants.

39. Defendants refer to, and I have read, HCDOM Section 3.1.12, Attached hereto as Exh. W. This is a true and correct copy of the regulations in effect on September 11, 2019, the day I encountered Munk at the dental clinic when he told me he could do nothing in providing a therapeutic (soft) diet, and that he could not order liquid nutritional supplements (Boost drinks) for me. (Munk MSJ decl. ¶35) In his MSJ decl. at ¶35, Munk refers to HCDOM Section 3.1.12, subsection (d)(1)(C), and subsection (d)(1)(A) to support his story. These referenced subsections did not exist until the 2020 revision of HCDOM Section 3.1.12. They are therefore inapplicable to any argument or defense on this topic. The Attached Exh. W is the controlling regulation regarding therapeutic diets, and it states clearly at subsection (c)(3)(D) that the dentist is responsible for ordering diets. A Registered Dietician, according to my understanding of HCDOM Section 3.1.12, is not — I believe — authorized to place orders for therapeutic diets, and a dentist is not mandated to refer me to a dietician prior to placing

1 an order for a therapeutic diet, again, based on my understanding and belief
2 from reading Section 3.1.12. HCDOM Section 3.3.5.11 (Attached Ex. V, which is
3 a true and correct copy of that provided to me by defendants), similarly, provides
4 that a treating clinician shall place an order for all nourishments and supple-
5 ments, and that they may be provided for people like me - who have dental
6 conditions causing difficulty eating regular diets. There is no mention at all
7 in this section of a Registered Dietician, nor anybody else whom the dentist
8 needs to consult, nor to whom the dentist needs to refer me. Based on my
9 reading and understanding of these relevant HCDOM Sections I believe that
10 Munk could have prescribed or ordered a soft diet for me, and could have
11 (and still can) order Boost liquid nutritional supplement for me.

12    30. At my last medical appointment weigh-in on January 15, 2021, I weighed
13 152 pounds. That is a 47 pound weight loss from my 9.27.18 reference weight of
14 199.6 pounds. I am able to eat only soft foods requiring no chewing, as well as
15 cakes and snacks I can soak in milk or water.

16    31. I have a prescription for tylenol and I currently take these for the
17 constant headaches I have experienced since about January, 2021. The tylenol
18 does not provide jaw pain relief, nor relief for my shoulder, neck, hand or left
19 hip pain. I am not associating these headaches with jaw condition as I know
20 nothing that leads me to such an association.

21    32. During the May 31, 2018, examination by Dr. Luque, he never told
22 me that his surgery would be any sort of cure-all for my TMD, only that it
23 would alleviate my pain when opening my jaw and eating.

24    33. Through discovery I asked certain defendants to admit to knowledge of and
25 adherence to applicable regulations, policies, etc., relevant to this matter. Attached
26 Exhs. G, H, I, and X are authentic, true, and correct copies of Admission provided by

1  these defendants.

2  34. Through discovery to defendant CDCR, plaintiff requested health care outcome

3  data and health care clinical evidence relied upon by CDCR to determine that surgery

4  for bone fragment removal from jaw joints to relieve jaw joint pain is ineffective

5  treatment. To both discovery requests, defendant CDCR responded that they have

6  no such documents of outcome data or clinical evidence.

7  35. Through discovery, and prompted by Munks declaration of having offered me

8  pain medication for my jaw pain (Munks MSJ decl. ¶21), I asked Munk about it

9  in a request for admission. His response is attached as Ex. T, and is a true and

10  correct copy of his response. (RFA 8)

11  36. Between February, 2018 and December 2019, defendant Munk treated me a total

12  of seven times (Win MSJ decl. Ex. B. pp. 24, 27, 28, 33, 36, 39, 40) On one occasion when

13  Munk completed a dental note the appointment was with the dental hygienist and not with

14  Munk. (Win MSJ decl. Ex. B., p. 8)

15  37. I have read and I understand the HCDOM regulations regarding the docu-

16  mentation requirements of a prison's DAR Committee. These regulations are contained

17  within the HCDOM at section 3.3.4.5. (Munk decl. to MSJ, Ex B, pp 10-13) This

18  version is identical to that produced to me by defendants, and the relevant sub-

19  section identified below is identical to the controlling version. HCDOM Section

20  3.3.4.5 (c)(2)(A)6. requires that every month an institution's DAR minutes will

21  be uploaded into the Dental Program headquarter's ShareDrive. These minutes are

22  to be posted—in this one—into the SVSP DAR Folder. I believe, based on my

23  reading of these regulations, that such uploading provides the CDCR Health Care

24  Services Headquarters staff with access to the DAR meeting records. Based on

25  my reading of these regulations I further believe that any DAR Committee

26  minutes relevant to events in this matter should be in the ShareDrive Folder

1  and/or that the CDCR should have access to that which the SVSP DAR committee

2  posted to the Sharedrive folder. On about Feb. 17, 2021, I requested from the

3  CDCR production of the SVSP DAR meeting minutes for the months relevant

4  to the DAR events in this action. Defendant CDCR was asked to produce the

5  DAR committee minutes which were posted to the Dental Program Headquarters'

6  ShareDrive for February, 2018, March, 2018, June, 2018, Sept., 2019, Oct., 2018,

7  and November, 2018. (See attached Ex. 4, RFP, 2, 3, 4, 5, 6, and 7, respectively.) CDCR

8  responded that it has no responsive documents in its possession, custody, or control to

9  produce for Feb. 2018 (RFP 2) and Nov. 2018 (RFP 7). CDCR responded that for

10 March, 2018 (RFP 3), June, 2018 (RFP 4), Sept., 2019 (RFP 5), and Oct., 2018 (RFP 6)

11 the relevant documents were already produced in RFP 37 to defendant Munk

12 which are nothing more than the original seven (7) pages of DAR documents previous-

13 ly produced to plaintiff, and which defendants purport to be those included in Ex. A

14 of the Ng MSJ decl. I have analyzed the previous production of DAR documents,

15 specifically the seven pages of the attached Ex. P and the partial documents of

16 the Ng MSJ decl. Ex A, and I have determined that by attending to what

17 defendants have produced there should - at the very least - be three pages for each

18 DAR monthly meeting. Based on this analysis, I believe there should be at least

19 twelve (12) pages of DAR monthly meeting documents for March, 2018, June, 2018,

20 Sept., 2019, and Oct., 2018, combined. When I consider this combined with non-

21 existence of documents for two of the requested meeting months, I believe that

22 defendants are not being completely honest about what they have done, and what they

23 have not done.

24     38. I made my ADA/RA claims in my Complaint. At the paragraph #41 for the

25 direct claim, and provided foundation at ¶¶ 36, 39, 40, 42, 45 (at 10:2-3), 46, 47

26 (at 11:4-7), 48, 49 (at 12:9-17), 51 (at 14:14-15:6), 54 (at 17:1-14), 55 (at 18:9-19),

56 (at 19:12-23), 57 (at 21:3-14), 58 (at 22:2-14), 60 (at 24:19-25:6), 62 (at
26:14-26), 63 (at 28:1-13), 64 (at 29:7-14), 65 (at 29:20-24, and at 30:5-8),
66 (at 31:15-22, and at 32:10-13), 67 (at 33.7-18), 75, 76, 103, 111, and 112.

39. I do not suffer from anything other than an eating impairment which
would make me unqualified from participating in CDCR's meal service and
exercise and excercation programs and activities. I know of no other reason that
I am not otherwise fully qualified to participate in those programs, services, and
activities.


I, Raymond Whitall, declare under penalty of perjury that the foregoing is
true and correct except for those matters stated on information and belief,
and as to those matters I believe them to be true and correct. Executed
on  May 17, 2021  , at Soledad, California.


Raymond Whitall,

Declarant

*Raymond Whitall*